## The People *vs.* Abraham Morrell.

Where a county is divided and two separate and distinct counties formed out of it by act of the legislature, to one of which a *new name* is given, whilst the other it is declared *shall be and remain* a separate and distinct county *by the name of the county as it existed previous to the division,* the judges of the county courts appointed previous to the division who happen to reside in that portion of the territory distinguished as a county with a *new name,* under the operation of the act requiring judges of county courts to reside within the county for which they are appointed lose their offices, and are no longer competent to act under their commissions ; whilst those of the judges who happen to reside in the portion of the territory which retains the *original name,* continue in office until the expiration of the term for which they were originally appointed.

*It seems* that it would have been competent to the legislature, by *express enactment,* to have continued the judges whose residence happened to be in the new county, until the expiration of their constitutional term of office ; but that by remaining silent, the office is gone.

A county may be divided by the legislature into two or more counties by a mere *majority vote ;* it is not necessary that a bill for such purpose should receive the assent of *two-thirds* of all the members.

Information in the nature of a *quo warranto.* On the first day of May, 1839, the attorney general filed the information in this case, charging the defendant with having usurped the office of *first judge* of the county of Fulton, and having used and exercised that office since the first day of January, 1839, without lawful authority. The defendant pleaded that on the second day of February, 1838, he was duly appointed first judge of the county of Montgomery, for the term prescribed by the constitution, (5 years,) and within the time required by law, took and subscribed the oath of office ; that on the eighteenth day of April, 1838, an act was passed by the legislature of this state, entitled " An act to erect a new county from a part of the county of Montgomery, by the name of Fulton ;" that at the time of his appointment as first judge of Montgomery, he was an *inhabitant* and *resident* of the town of Johnston, then in the county of Montgomery, and still remains a *resident* of that town ; that by the act above referred to the town of Johnstown is made to form a part of the county of Fulton.   By means of which premises

he, the defendant, was and *is first judge of the county of Fulton;* and by that warrant and authority uses and exercises the office, &c. To this plea the attorney general demurred.

*Willis Hall,* (*Attorney General,*) for the people, insisted that by the "act to erect a *new* county from a part of the county of Montgomery, by the name of Fulton," a separate and distinct body corporate and politic was created, as much unconnected with Montgomery as with any other county in the state; and that after the first day of January, 1839, when the act went into full effect, the defendant had no authority to hold the office or perform the duties of *first judge* of the county of Fulton. He could exercise the duties of his office *only by virtue of his commission,* which authorized him to act, not as first judge of Fulton, but as first judge of Montgomery. The latter county, as it existed at the time of his appointment, was no longer to be found; it had been divided into two separate and distinct counties by the legislature, who possessed the power to make such division, and had exercised the right since 1691, when the then province of New York was divided into *ten* counties. Besides, the right of the legislature to make such divisions is expressly recognized by art. 1, § 6 and 7, of the constitution. Fulton, he insisted, was a *new county,* whilst Montgomery remained the identical county, it was previous to the passage of the law, with the exception of a diminution of its territory, and in support of this proposition adverted to the *title of the act* and to various of its provisions. The act, he observed, did not directly designate the defendant first judge of the new county, nor could it do so *indirectly.* The claim of the defendant necessarily assumes two propositions: 1. That by such act of the legislature he was *removed* from the office of first judge of Montgomery; and 2. That by the act, or by the operation thereof, he became first judge of Fulton. The first proposition, for the sake of the argument, he was willing to concede; but claimed its consequences which were: 1. That the act was constitutional and valid; 2. That the act of the legislature requiring judges

to be *residents* of the county of which they were officers, was also a constitutional and valid act; and 3. That the appointment of the defendant as first judge of Montgomery and his commission under such appointment were annulled. But he denied the second proposition, because the legislature did not not possess the constitutional power to appoint the defendant first judge of *Fulton ;* the act erecting the county of *Fulton*, grants to it all the rights, privileges and immunities possessed by the other counties of the state, § 1; and the constitution guarantees to every county, judges of its courts, to be appointed by the governor, with the advice and consent of the senate. Art. 4, § 7. If the legislature possessed such power, they had not, he said exercised it in the present case; but, on the contrary, had negatived their right by § 24 of the act, whereby it is enacted that, for all judicial purposes, as it relates to the courts, the counties of *Montgomery* and *Fulton*, should be considered as one county, *until the* 31*st December next,* after the passing of the act, " and that the present judges of the county of Montgomery" should continue to exercise the duties of their respective offices in the said counties until that day, but no longer. The fact of the defendant happening to reside, when the act was passed, in a portion of what formerly constituted the county of Montgomery, but was now embraced in the county of *Fulton*, did not confer upon the defendant the right to exercise the duties of the office of first judge of Fulton; nor was such the understanding of the legislature. By § 23 of the act in question, the legislature directed an election in *Fulton* of a sheriff, clerk, and three coroners, although the *sheriff* of the former county of Montgomery was a resident of that part of the old county which was created into a new county. The opinion also of the executive of the state was in accordance with this view of the question, for he *nominated* the present defendant first judge of *Fulton ;* and a *surrogate* was actually appointed, although the former incumbent was a resident of Fulton. Besides, on the same day, the present defendant was appointed a master and examiner in chancery, notwithstanding he held unexpired appointments to the same offices for the county of Montgomery.

The attorney general further insisted, that a. *commission* duly signed and under the seal of the state, is essential to the tenure of the office and to the legal discharge of its duties ; in support of this proposition he cited 1 R. S. 108, § 17, 20, 21, 22, and *Marbury* v. *Madison*, 1 Cranch, 137, 173, 145, 156, 157, 158, 159, 160. Finally : he contended that if by any construction the defendant could be deemed to have become first judge of the county of Fulton, on the first day of January, 1839, he had forfeited his office by omitting to take the oath of office within 15 days after the commencement of his term of office. The constitution peremptorily requires that all officers, executive and judicial, shall, before entering on the duties of their respective offices, take and subscribe an oath of office, art. 6, § 1 ; and this without reference to the mode in which the offices are conferred. Now admitting, for the sake of the argument, that by the operation of the act creating the county of Fulton, the defendant by reason of his former appointment and his residence in the county of Fulton, became first judge of the latter county, it was incumbent upon him to have taken the oath of office within 15 days after the first day of January, 1839, see 1 R. S. 119, § 21, and having omitted to do so, the office became vacant.

*C. McVean*, for the defendant. It is admitted by the pleadings that the defendant was duly commissioned by the governor, with the consent of the senate, on the 2d February, 1838, as first judge of the county courts of the county of Montgomery ; that he took the constitutional oath of office on the 10th of February thereafter; that he was then a resident of Johnstown, and entered upon the discharge of the duties of his office, and that he has continued ever since to reside there and discharge such duties. The constitution, Art. 5, § 6, declares, that "judges of the county courts shall hold their offices for five years." It is not pretended that he has resigned his office, nor forfeited it. Neither has the legislature required him to do any thing as a condition precedent to his retaining his office. The attorney general has not, either in the information or in his

The People v. Morrell.

argument, asserted that the defendant is not now in office in pursuance of his commission. The proposition that he has lost his office, is so flagrantly in violation of his constitutional rights, that it meets no advocate any where. The proposition that he retains his office consistently with his original and continued residence in Johnstown has not been denied, but on the contrary has been affirmed by the different branches of government, in whom rests the appointing power. The position that the defendant is in office, and in office consistently with his residence, is assumed to be undeniable, *because it rests on the constitution,* and every argument assailing it, or not in harmony with it, must be discarded in the consideration of the question in controversy.

The next question is, *over what portion of the original territory* of Montgomery must he exercise the jurisdiction conferred by his office? The attorney general has not ventured to speak to this point, further than to insist that the defendant cannot exercise the jurisdiction of his office in that portion of the territory now included in the bounds of Fulton county. The position that he assumes is, that the present county of Montgomery is the same county that existed at the time of the defendant's appointment, and that Fulton is a *new* county. This is denied. The defendant contends that they are both portions of the old county of Montgomery, and are *both new counties* carved out of the old county, and that there is nothing new about the substance of the one more than the other; and the only difference between them is, that the legislature have thought fit to confer the name which they once jointly possessed on the one, and to give a new name to the other. In favor of the position that *Fulton* is a *new* and *Montgomery* an *old* county, several provisions of the act making the division are referred to as seeming to recognize such a distinction; but upon a careful examination, it will be found that both counties are expressly *created* by the act, and are both created "separate" and "distinct" counties of the respective names given by the act; and in the instances in which there are provisions in regard to Fulton and not to Montgomery, they are those only in which legislation was superfluous, by reason of general laws already enacted applicable to all coun-

The People v. Morrell.

ties. It will be observed, also, that in every instance in which legislation, was necessary by reason of both being new counties, and of there being no general statute uniform in its application to all counties, provisions have been made as to each county in the act. For example, take the coun-. ty courts—the terms in each county are established. In Montgomery, they are in the act prescribed to be held on the second Monday of June, September, December, and March. Now it so happens that the courts were held in Montgomery, before the division, on the same days. Why then this legislation? Was it necessary, or was it super-fluous? The attorney general says it was superfluous. The defendant insists it was indispensably necessary. The judg-ment of the legislature on this point is manifested by the provision itself; it was deemed necessary. It was not in the power of the legislature, by declaration, to make one of these counties *new* and the other *old,* if such were not their real character. In substance, they are two new counties created out of one; and it cannot be that a name can change their essential character; for then a transposition of names would change the character of both, and this, would make the shadow efficacious to control, and the substance and essence of the thing a nullity. The division of *Niaga-ra* county affords an illustration of this point, Statutes, sess. of 1821, page 220; one portion was called Niagara and the other Erie. It so happened that the county buildings were in Erie. By referring to that act, the same provisions for the organization of the new Niagara will be found, as in this, for the organization of Fulton, and the same silence in re-gard to Erie as in this to the new Montgomery; and yet Erie, in that case, succeeded to all the rights and privileges that the new Montgomery has in this. Which county in that case was the new, and which the old? Neither; for in that case, as in this, to give either such a character as is claimed, would lead to absurd consequences, and be in con-tradiction of *the fact,* having an independent existence from its very nature; that *both are new.* This point has also been decided by the chancellor on appeal from the decree of the vice chancellor of the eighth circuit. 6 Paige, 639. There,

school district No. *one*, in the village of Buffalo, had a right to certain compensation from the general government for the destruction of a school house by the enemy during the late war. After the right had accrued and before the money was paid, district No. *one* was divided into districts Nos. 1 and 2. District No. 1 contended, that notwithstanding the division, its corporate indentity existed as before ; that it was the same old district, and that No. 2 was a new corporation; and so the vice chancellor decided. On appeal, the chancellor reversed this decision, on the ground that the division made them two new corporations.

There is a provision in the constitution of this state which it is submitted has an important bearing upon this point. The constitution, article 1, § 7, provides that " no *new* county shall hereafter be erected, unless its population shall entitle it to a member." If this court decide that one of these counties is a new county and the other an old county, a judicial construction will have been given to the term *new*, (the term used in the constitution,) which will limit the constitutional prohibition accordingly. When a county hereafter is to be divided, the legislature has only to be careful that the county which it declares to be new shall have the requisite population, and as there is no constitutional restraint as to the population *of the old*, it will be a matter of entire indifference what its population may be. Under the license of such a judicial construction the constitution would be practically nullified; and the legislature could, by observing distinctions, create as many new counties as it pleased, provided all the old counties in name are left *established*. The only remedy against such an infraction of the spirit and intent of the constitution is with the judiciary, and this court will not, in advance, put such a construction upon words against facts as will authorize the legislature, at its pleasure, to violate the instrument intended to restrain legislative action within prescribed boundaries as to the creation of counties.

The 24th section of the act suspends the right of both counties to hold certain courts in either county until the first of January thereafter, and then declares, that for the purposes

mentioned the two counties shall be considered one county; the section then declares that the defendant shall be judge of the two "distinct" and "separate counties" created by the act, until the first of January thereafter. The first clause of the section reserved all his powers as to the judicial unity, and the last clause assigned to him the powers of his judgeship by name to the two *new* "separate and distinct counties created and named in the act; for he is authorized expressly to discharge "the duties" of his office, not in the *one* county of Montgomery as reserved, but "in the said counties of Montgomery and Fulton." The office without its duties is an abstraction, and it is the duties of an officer which constitute an office and are *its* attributes. He was required by the act to discharge all the duties of the office of first judge of Fulton that pertained to that office in the "distinct" county of Fulton. He was bound, as first judge of that county, to act under the landlord and tenant act, for which purpose that county was as "distinctly" and "separately" organized as St. Lawrence county; and under which act no judge but a judge of Fulton, as an independently organized county, could have jurisdiction. He was bound, in case of vacancy, to act as surrogate of that county, for it is not pretended that county was not entitled to a "separate" surrogate's court. He was bound, as judge of that county, to hear appeals from the commissioners of highways, to issue attachments, to grant insolvent discharges, and to do all such other acts as judge of that county as were not included in the reservation by which, for certain purposes, the two counties were continued as one county until the first of January. He was then, by the act itself, judge of Fulton county *eo nomine.* All the judges of old Montgomery, without respect to their residence, were made judges of the two new counties for a limited period. On the first of January the defendant ceased to be judge of the new Montgomery, by reason of his non-residence. He was a judge of Fulton on the 31st December, and he was also on the first of January, because he was a resident; because he had been a judge of that county by law, consistently with his commission; because it was not in the power of the

legislature to shorten his term of service; because the legis-
lature affixed that only as the time during which he was to
be judge of the *two counties*, and because the general statute
requiring residence, by operation of law assigned that coun-
ty to him after the period had expired in which the judgeship
of the two counties was to continue without regard to resi-
dence, and excluded him from the judgeship of Montgomery.
The general law requires residence—the law creating the
division, by express terms, made him a judge for six months
of Fulton.   The legislature had the power to declare him
judge of Fulton under his commission.   They did do so, and
it made him judge.   The legislature had no authority to limit
his term to six months; and in a parallel case this court has
decided the assignment good, and the limitation bad, as
against the constitution.   1 Cowen, 550.   6 id. 642.   That
such was the intention of the legislature, is manifest from
other provisions in the act of division.   All the *county officers*
elected by the people, whose term is secured by the consti-
tution, were at the time of the division residents of that por-
tion of the territory now included in Montgomery, except
one coroner.   The act provides for the election of a sheriff,
clerk and *three* coroners in Fulton.   The legislature acted
as if it were a conceded fact that each officer retained his
office in the county of his residence, and the will of the legis-
lature, when its power is conceded, ought to prevail.   The
attorney general denies the competency of the legislature
to make the assignment claimed, and insists that the com-
mission and the oath of office, required by the constitution,
must *in terms* conform with the power claimed—that the
defendant has no commission as judge of Fulton county, and
has not taken the oath of office required by the constitution
as judge of Fulton, and that he has no right to act as judge
there; neither could the legislature confer such right.   The
right of the legislature to enlarge or diminish the jurisdiction
of an officer in commission, both as to subject matter and
as to territory, has been uniformly exercised and as uniform-
ly sustained by the courts.   Indeed, so far as authority goes
it is an unquestioned right.   1 Cowen, 550.   6 id. 642.   19
Wendell, 27.   There can be no doubt that the legislature

could extend the jurisdiction of a judge over twenty coun-
ties, without incurring, in a legal sense, the imputation of
having legislated him into office.

All the principles contended for by the defendant have
been established by legislation and judicial construction.
The legislature has provided, that upon the division of a
town, or the alteration of the bounds of a town, if more
than four justices are thereby put in a town, they shall never-
theless continue to be justices of the town of their residence.
1 R. S. 102. This is an assertion of legislative power clear-
ly in point, admitting that a justice is a town officer. In that
case, the legislature were embarrassed by the constitutional
restraint as to the number of justices in a town, (an embar-
rassment that does not exist in relation to judges of a county,)
and still the rights vested in an individual by the constitution
were held to be the permanent rights. How much clearer is
the case of judges which involves no constitutional contra-
diction? In the cases decided in 1 Cowen, 550, 6 id. 642,
the following principles are established : 1. The right of an
officer to his office for the constitutional term of his appoint-
ment; 2. The power of the legislature to divide towns and
counties must be exercised subserviently to the right of office
in persons where the tenure is fixed by the constitution; 3.
That officers, upon a division of a county, are officers of the
county of their residence. These principles applied to this
case decide it. It has been asked if Saratoga county, the coun-
ty of the residence of the judge of the fourth circuit, were set
off to the third circuit, and the judge continued to reside in
Saratoga, would he be judge of the third circuit, or would
he lose his office? The answer to that question would in
no manner decide this, as the power of the legislature in re-
gard thereto is not the same. There can be by the consti-
tution but eight circuits, and one judge to each circuit; and
that case would present a grave constitutional question which
does not exist here, as there are no such impediments.
Again, it has been asked, if a town in a county having a
judge in it should be annexed to another county with five
judges, would that judge continue in office? The legisla-

ture has the power to place as many judges in a county as it pleases and has exercised that power in the case of justices of the peace, even against another provision of the constitution touching the number in a town ; and where the power is conceded, it must also be conceded that the legislature is bound to exercise it subordinately to the constitution as the usual plea justifying usurpation, necessity, cannot even be suggested. But suppose that judge was first judge, would you have two first judges ? The designation *first* judge is unknown to the constitution; it was made by the legislature, and the legislature has the power to regulate and declare how and where he shall exercise the duties of his office ; and what the legislature can do, it is bound to do in support of constitutional rights. If the legislature neglected to do what it could, or should have done, which would stand or which would fall, a statutory incongruity, or that instrument, upon the maintaining of the inviolability of which, in all the departments of government, the whole fabric of our civil liberty rests ? There is no such degeneracy in the times as to require an answer to such a question.

It has been said that the governor appointed a surrogate in *Fulton* where the surrogate of old Montgomery resided ; and that that is a case in point, showing the judgment of the executive. The cases are not parallel. The surrogate is an officer not known to the constitution. The legislature can unmake that which it has made, but is wholly impotent as to that which the constitution has placed above and beyond it. The attorney general has with great industry collected from the executive records numerous instances in which, upon a dvision of a county, judges in commission received new commissions in the county of their residence, but not a single instance in which an individual in commission has been superseded. This uniformity is the strongest recognition of a right that is questioned that could be presented. The first time the right has been practically denied, is the instance now before the court.

A justice of the peace elected in a town in old *Montgomery*, has, under the laws and decisions of this court, a right to sit as judge of the general sessions of *Fulton*. This

case is strictly analogous in principle, whether a justice of the peace be considered a town or county officer. The duties of an office define its character. At the time of the adoption of the constitution, the duties of a justice were stated in his commission. He was "a justice assigned to keep the peace in the county, and also to hear and determine divers felonies, trespasses and other misdemeanors in said county perpetrated;" in other words, he was the conservator of the peace, and a judge of the county court. The duties of a justice are the same under an election as under his commission; nor has any law abridged his jurisdiction or changed its character. How can a justice of the peace sit as a judge of a county court? He is a judge as a justice of the peace, *ex vi termini*, notwithstanding the seeming constitutional provision to the contrary, which required judges of the county courts to be appointed by the governor and senate. Are not all his duties in character the same as those of the defendant? Neither of them are the court; they are members of the court, and hold their offices absolutely independent. Both are judges of the same court; have other judicial duties to perform; are local officers, and have their term of office secured by the constitution.

By the act making the division, the town of *Perth* was taken from the town of *Amsterdam*, and is in Fulton, and Amsterdam is left in Montgomery. By the laws of this state, a justice of the peace cut off from the town of Amsterdam and residing in Perth, is qualified to sit as a judge of the county court of Fulton. By what authority does he so sit? As a justice of the peace of the town of Perth, in the county of Fulton. What is his commission? And where is his constitutional oath of office? His commission is for the town of Amsterdam, in the county of Montgomery; both foreign corporations; and he has taken no oath of office except for them. According to the argument of the attorney general, his title is totally deficient and he has no right at all; yet it stands decided that he has such a right. And can it be said that the defendant cannot sit as judge of the same court when his commission covered every part of

the same territory alike? There is a distinction between the two cases, but no difference in principle.

*By the Court*, COWEN, J. By art. 1, § 7, of the constitution, the power of the legislature to create new counties is recognized, under the restrictive words: "No new county shall hereafter be erected, unless its population shall entitle it to a member" [of assembly.] By art. 4, § 7, "The governor shall nominate, &c., and with the consent of the senate, shall appoint all *judicial officers*, except justices of the peace," &c. By art. 5, § 6, "Judges of the county courts, &c., shall *hold their offices for five years*," &c. The question presented by the demurrer is, whether the office of Judge Morrell, who was duly commissioned and sworn as first judge of the county courts of Montgomery, was vacated by the division of that county into two counties.

The act is entitled "An act to erect a new county from a part of the county of Montgomery, by the name of Fulton," &c. Statutes, sess. of 1838, p. 328. The first section declares that the whole of Montgomery lying north of the prescribed division line, should be a separate and distinct county; and be known and called by the name of Fulton, &c. and that all the remaining part should be and remain a separate and distinct county by the name of Montgomery. The statute declares what would necessarily result as an operation of law, that the new county of Fulton should be entitled to and possessed of all the benefits, rights, privileges, and immunities, and be subject to the same duties, as the other counties of this state. Among those rights, is that to have a court of common pleas and general sessions of the peace, the times and places of holding which, after the 31st day of December, 1838, when Fulton was to become a new and distinct county, for the purposes of judicial business, were prescribed by the ninth section of the act. It is declared that the judges of the common pleas of the new county shall have power to cause a seal to be made for that court, &c. § 26, with various other provisions; none of which, however, indicate on the part of the legislature, any intent to continue the judicial officers in place for either county. Whether they remain, therefore, or

their places became vacant by the organization or creation of the two counties out of the old one, was left entirely to the operation of the constitution and the general laws, upon such a juncture of circumstances.

Independent of the restriction imposed by the constitution in respect to the tenure of office, there is no question that the legislature have the power directly to restrict the term during which a first judge shall hold. It is of the nature of legislation to create and abolish offices accordingly as they may be deemed useful or superfluous; and I am aware of no constitutional restriction which would prevent their discontinuing the county courts altogether, and substituting other jurisdictions of a more general or a more limited territorial extent. The county judges were created and their number limited by statute. 1 R. S. 87, 2d ed. Nor does the constitution any where declare even their existence to be essential. So long as they shall be required by statute, the constitution demands that they shall be nominated and appointed by the governor, on the senate consenting. But should the office be abolished and their powers transferred to a jurisdiction of greater or less territorial limits, the tenure of office would be gone. In the very instance before us, the legislature erected a court whose jurisdiction from April till December, 1838, covered two counties; and can any one doubt that they might now restore and continue the same power to judges who should be appointed according to the provisions of the constitution? The superior court of the city of New York was created by statute, with a jurisdiction, in respect to subject matter, greater than the common pleas of that city. Does any one doubt that the legislature might have merged the common pleas of that county or even of several others in the same court, had they been satisfied that such an act was necessary for the public good? I do not understand the state legislature to be restricted in their power any more than the British Parliament, except by the state and federal constitutions.

What then is the amount of constitutional restriction in the case before us? The county and the county courts of

Montgomery existing it was impossible for the legislature to remove Judge Morrell, or abridge his term of office. But the legislature had the power to create new counties out of the old one, provided the enumeration of inhabitants would warrant it. The following point was submitted to us by the counsel for the defendant: "The first section of the act of the legislature created two new counties, not by implication but by direct enactment. One is named Fulton, the other Montgomery, and the privileges that Montgomery has over Fulton are not secured by its *name;* but by express legislative grant in the 12th section. [The section which grants to the new county of Montgomery a property in the *records* of the old county of that name.] It is unnecessary to decide whether the point, so far as it asserts that the present county of Montgomery is a *new county*, in the legal sense of the term, be correct. The mode in which the legislature have expressed themselves indicates an intent, as I think, to continue the old county of Montgomery in that which retains the old name. Several other features of the act mentioned by the attorney general in the course of the argument, favor that idea. This being the case, no objection is perceived to the conclusion which seems to have been drawn by the government, that the commissions of such of the former officers of Montgomery as are qualified by local residence, should be considered as still in force with regard to the county of the same name. It is, in legal effect, the old county curtailed by the territory taken off for the new. But the constitution, as well as the nature of the office implies, and the statute, 1 R. S. 93, § 12, 2d ed., Id. 111, § 37, sub. 4, expressly requires residence within the county, as one essential qualification of a county judge. Judge Morrell fails in that qualification by being left without the boundaries of Montgomery, and within a county professedly new, and it seems impossible to maintain that, so far as the *new county* is concerned, it has not lost all legal identity with the old. Its territory, its inhabitants are no longer known as those of *the* Montgomery, for which Judge Morrell was appointed. Its towns are some of them intersected by the line of division. The statute which created the

county for which he was commissioned is, *as to Fulton,* repealed ; and the county is unknown to the constitution or the law.    It *was* part of *Montgomery ;* it *is now* the new county *Fulton ;* and so completely is its identity gone by the dissolution, that, independent of any provision by statute, it would be absolved from all debts and duties due from, and deprived of all participation in the claims of the former county of Montgomery.   2 Kyd on Corp. 516.   1 Willcock on Municipal Corp. 330, pl. 858.   The corporate succession is broken, and, at common law, all property in possession or in action, which its inhabitants could otherwise have claimed as corporators, would have reverted to the original donors, or vested in the state.  Id. id.   To guard against such a consequence, on the division both of towns and counties, the legislature of this state have interposed by statutes, 1 R. S. 330, 358, 2d ed. and provided for a summary distribution of property, &c., by commissioners.  By another statute, actions may be brought in the name of the supervisors, loan officers, &c., and superintendents of the poor of a county; and an action lies against the board of supervisors of a county.   2 R. S. 387, 8, 2d ed.   Can it be pretended for a moment, that an action would be sustainable by or against the board of supervisors of *Fulton* in respect to rights or liabilities contracted by the old county of *Montgomery ?*   I admit that merely changing the name of an old corporation, even with the addition or subtraction of rights, would not work a change of identity.   Several cases are cited to this effect in 1 Kyd on Corp. 232, 3, n. ; but I do not find that the cases go farther.   To sustain the supposed action, you must be enabled to aver and prove that the corporation, bearing both the old and new name, is the same.   The statute which divided the counties might have declared that the old should have been continued in the new, and been considered the same ; but so far from doing this, it seems to look for corporate succession, to the new county of the same name. In trying the action we have supposed, it seems clear that a judge would be bound to charge the jury as matter of law, against the truth of the supposed averment.   In the case at bar, the pleader has not hazarded such an averment.   His

logic is, " I *was* the first judge of Montgomery; therefore, I am the first judge of Fulton," which he admits to be a new and distinct county. The conclusion that he is first judge of Ontario would seem to come with equal force.

The difference between the case before us and a mere *formal* change is quite obvious. Under a mere change of name, the commissions of the judges and all judicial acts might have continued the same *'mutatis mutandis*. There would have been no substantial alteration. Had a town been added or set off, it would have been but an enlargement of territorial jurisdiction in the first case, and a contraction in the last. The commissions of the judiciary are granted and accepted, subject to all such changes as the legislature may think themselves bound to make from time to time, within the limits of their constitutional powers. No one doubts their power to add to or subtract from the territorial jurisdiction of local courts, nor to do the same thing in respect to subject matter. Indeed the latter may be said of any court, even that for the correction of errors. It does not follow that, because a court is created by the constitution or otherwise, its measure of power must therefore always continue the same.

The legislative power of creating *new counties* is equally plain in the nature of things with that of enlarging or contracting jurisdiction; it is equally sanctioned by practice in all times, and is expressly recognized by the constitution. New counties must be created out of the old; and then, even if the old offices could exist as abstractions, or in contemplation of law, they certainly cannot, by mere operation of law, be applied to *the new corporation.* The legislature doubtless have the power to continue them in the new county by express enactment. By doing so to the end of the constitutional term, they would detract nothing from the power of the executive department. But by remaining silent, the office is gone for all practical purposes. The county for which Judge Morrell was appointed was created by statute. It was capable of destruction by the same power; and it has been destroyed *pro tanto.* Was it ever thought that after a corporation is dissolved, its mayor or

other officers still retained their places, whatever the term for which, by charter, they might have been elected? They are but incidents to the corporation, which is an artificial being, capable of dissolution by act of the legislature, except in those cases wherein their power may be restrained by the constitution of the United States. 2 Kyd on Corp. 447. One effect of a dissolution is, that all corporate privileges and franchises are extinguished; and the creating power may either restore it, or incorporate another set of men in the same place. Id. 516. By proceeding to separate a part of the territory from an old county and erect it into a new, the legislature have incorporated another set of men as effectually as if the acts of dissolution and creation had been by separate statutes enacted at any distance of time from one another. One incorporated village, A., is divided by statute into two distinct incorporated villages, viz. B. and C.; independent of an express statute declaration, no lawyer would think of suing either B. or C. or both, for a debt due from A. Such a division the legislature may make even by a majority vote, either of cities or villages. *The People* v. *Morris*, 13 Wendell, 325. These are, like towns or counties, mere political bodies, and their powers may be modified, or the corporations themselves abrogated. Id. The recorder of a city is also constitutionally commissioned for five years. Const. art. 5, § 6. But he can no more hold his office after the city charter is repealed, than if the city should be physically destroyed. A simple legislative division into two new distinct cities would work the same consequence. In 1784, the town of Hempstead, owning lands as a corporation, was by statute divided into two towns by different names, South Hempstead and North Hempstead. The latter filed a bill against the former, for a partition of the common lands of the old town, which was dismissed by the chancellor, and the decree affirmed in the court of errors. *North Hempstead* v. *SouthHempstead*, Hopkins, 288. 2 Wendell, 109. Chancellor Sanford said that, by the division, *two new corporations* were established in the place of *one*; and each of the new political bodies had a capacity to hold land within its own limits. The succession of the old town

was holden by both courts to be broken by the division, which in legal effect was adjudged to be an assignment of the common lands of Hempstead situate in each town, to the new corporations. On appeal, Savage, Ch. J. who delivered the opinion of the court, put the case of dividing one state or one county into two, and thought that the public property of the old would fall to the share of the new political bodies, so far as it should lie within their limits; and this may well be taken to be the legal effect of such a division. But no one pretended in the course of the cause that either new town was identical with the old one. A division by operation of law, or by an implied legislative assignment, may well be predicated of the former lands common to both, without its following that officers retain their commissions for each according to their respective residence. Land is severable, and our general legislation has long contempla ted that each town should control the common lands lying within its borders. Real and personal property is apportionable by the courts between corporations as between individuals, according to their legal or equitable rights as proprietors. See *Potter* v. *Chapin*, 6 Paige, 639. It always finds a title to property somewhere; while an office is but the political adjunct of a political person; and cannot, in the nature of things, exist, when the latter becomes extinct. The dissolution of a corporation is, at common law, like the death of a natural person without heirs or distributees. It leaves no one to take its property or franchises as successor. The legislature may provide for a transfer, but the act enures by way of assignment, not as a corporate succession, unless it provided for renewing and continuing the old corporation.

On the whole, I have been unable to perceive that this new county, formed of a fragment from the old, can, in any sense, be considered its successor, or in any manner the same; and it seems to me that it must follow, according to the plainest reason and propriety, that the commission of judge for old Montgomery cannot as such have any existence in connection with the new county of Fulton. In saying so, I must of course be understood to mean such reason and propriety as I have been able to derive from the lan-

guage of the existing constitution and laws. I cannot deny that the legislature intended or rather desired to continue the commission of the defendant for the new county, and that they believed they had done so; nor do I deny that it would have been proper in a moral sense. Such a denial would be to contradict the high opinion which, through personal acquaintance, I have had the fortune to imbibe of the capacity and merit of the incumbent with whom the state is litigating. But I cannot avoid the conclusion that the legislature have, however unfortunately, when the measure is viewed as interfering with the general purpose of judicial independence, or wanting in justice to the man, inadvertently I have not the least doubt, failed to give any express or implied implication upon which we can refuse to render judgment of ouster. I am entirely satisfied from the best consideration I have been able to bestow, upon the case, aided as I have been by able arguments on both sides, that such an act would be to *legislate*, not to *adjudicate*.

Nor have I felt materially embarrassed in advancing to this conclusion, from any authorities which were cited on the argument. It was supposed by the counsel for the defendant, that the principle of the cases of *Ex parte M'Collum*, 1 Cowen, 550, and *The People* v. *Garey*, 6 id. 642, is adverse to the power of the legislature, so to alter counties, or other municipal corporations, or create new ones, as to abridge the constitutional duration of those offices which pertain to them. The first case held that a legislative organization of a new county, by combining several definite subsisting towns of other counties, and declaring that the justices already appointed for those towns respectively should hold for the residue of their terms in the same towns, and relatively to the new county, was constitutional. The last case held that, on a similar erection of the county of Orleans from definite subsisting towns of Ontario county, the legislature had no power to abridge the term of office for which the several justices had been appointed, while their towns belonged to Ontario; and a provision to that effect was declared to be unconstitutional and void. But in neither case was there even a change in the *name* or *territorial*

*limits* of the corporations to which the offices in question belonged ; much less an actual dissolution of those corporations. It is true some general remarks were made by the learned judges who delivered opinions in those cases, which, as it is supposed, give countenance to the proposition contended for by the defendant. In the first case, 1 Cowen, 566, 567, the chief justice intimated that the legislature have no power incidentally to abridge the term of a justice's office by altering the bounds of counties; because what the legislature have no power to do directly, they cannot do indirectly. The proposition is undoubtedly true, when an exercise of their power is unqualifiedly forbidden. But when the prohibition is under qualifications merely, the case is entirely different. The alteration of counties may sever a town into such small appendages of different counties as to render its complete subversion by annexation to other towns, an act of decided expediency, with which I am not prepared to admit that the tenure of office should interfere. Both the cases cited, concede that the jurisdictional alterations may be made without limit, both as to territory and subject matter. All the powers of all the common magistrates in the state, for instance, might be abolished or transferred to the county judges. It is impossible to allow the constitutionality of such an indirect abolition of the office ; and to deny, at the same time, that the same thing may be incidentally done in respect to a few magistrates, by the exercise of another power which is admitted to be of itself, clearly constitutional. In the two cases cited, there was no necessity for contravening the consequences of exercising such a power. Justices were considered as town officers, a character which it was deemed essential to fix upon them in order to warrant the adjudication in *The People* v. *Garey,* 6 Cowen, 650, see also *Gurnsey* v. *Lovell,* 9 Wendell, 319, and *Schroepel* v. *Taylor,* 10 id. 196. And when Mr. Justice Sutherland remarked, 6 Cowen, 651, that the power of the legislature to erect new counties was subject to the constitutional limitation of the justice's term, he evidently intended a case where the corporation to which his office pertained was saved. That was the case before him. And

the remarks of the chief justice in *M'Collum's case* should be taken with the same restricted application. Had the power of appointment for a certain time, been, in the case before us, granted in general terms, and the constitution had done nothing more, I agree that the legislature must have awaited the expiration of the time, before they could have given such an effect to the division of a county as to destroy the office. But we are no longer bound to carry out the full force of the general terms, when a clear convicting power is deducible from the context, either by express provision or necessary implication. 1 Story's Comm. on Const. Law, 407, § 424. In the state constitution, such powers indicated in both ways, are abundant. Besides the express power, recognized as we have seen, to create new counties, it is of the very nature of legislation to control judicial jurisdiction, and even subvert or dissolve the substratum, the municipal corporation to which it is incident. It is scarcely necessary to observe that in construing the language of a constitution, we have nothing to do with arguments *ab inconvenienti*, for the purpose of enlarging or contracting its import. Id. 408, 409, § 425 and 426. "The only sound principle is to declare *ita lex scripta est*, to follow and to obey." Id. 410.

We are all of opinion that there must be judgment of ouster.