## Potter *vs.* Chapin and others.

Where the inhabitants of a village, previous to the act for the organization of school districts, contributed by voluntary donations to a fund for the erection of a school house for the use of the neighborhood, and the school house was subsequently destroyed by the British troops, and congress afterwards passed an act to remunerate those whose property was thus destroyed; and previous to the passage of such act the village where such school house had been erected was incorporated into a school district; *Held*, that the fund afterwards received under that act belonged to such school district and not to the original contributors to the fund. And the school district having been divided into two districts before the receipt of the money from the United States; *Held*, also, that the fund belonged to both districts in proportion to the taxable property in each at the time of the division.

The court of chancery will sustain a gift or bequest or dedication of personal property to public or charitable uses, if the same is not inconsistent with local law or public policy, and where the object of such gift or dedication is specific and capable of being carried into effect according to the intention of the donor.

1837.

Potter
v.
Chapin.

1837.

Potter
v.
Chapin.

Whether a devise or gift of real estate for public or charitable uses is valid, where the legal title is not vested in some one capable of taking and holding real estate for the purposes of the charity according to the provisions of the revised statutes? *Quære.*

Upon separate appeals by the different defendants, in a suit to settle their rights to a fund in court, costs cannot be awarded between the different appellants, unless they have made each other parties to their respective appeals.

August 1.  Thıs case came before the chancellor upon appeal from the final decree of the vice chancellor of the eighth circuit, made between the defendants in an interpleading suit. The bill was filed against three different classes of claimants of the fund in the complainant's hands. The origin of the fund and the facts upon which the rights of the several parties depended were as follows: About the year 1806, and previous to the passage of any law for the regular organization of common school districts in this state, the defendants Chapin and Wells and several others, who were inhabitants of that district of country which is now the city of Buffalo, and who constitute one class of claimants in the present suit, by voluntary donations of money, labor and materials, contributed to a common fund for the erection of a school house, for the use of themselves and the other inhabitants of that neighborhood or district. The frame of the school house, before the building was completed, was by common consent removed from the lot on which it was erected to lot No. 73 in the village of Buffalo, belonging to the Holland land company; which last mentioned lot the inhabitants of the village then supposed was to be given to them, by the company, as a permanent site for a school house. The building having been completed, it was occupied as such for the use of all the inhabitants of the village until December, 1813, when it was burned by the British troops. After this event, the Holland company's agent sold lot No. 73 on which the building had stood; and he promised to give the inhabitants of the village another lot, for their school house, in lieu thereof. At the time of the burning of the school house the town of Buffalo had not been divided into school districts, under the general act of June, 1812. But it was so divided previous to the 4th of October, 1815;

in which division all the inhabitants of the district or territory for whose use the school house was originally designed were organized into a single school district, and designated by the school commissioners as district No. 1. In 1817, H. B. Potter, the complainant in this suit, as the voluntary agent of the inhabitants of the district, but without any special authority from the trustees, presented a claim to the commissioner of the United States for claims, under the 9th section of the act of congress of April, 1816, as modified by the act of March, 1817, for the purpose of obtaining compensation for the school house which had been thus destroyed. He also introduced the necessary proofs before the commissioner to establish the claim in behalf of the inhabitants of the district under those acts. The claim, however, was not finally disposed of by the commissioner within the two years allowed by the act for his continuance in office. It therefore remained dormant until the passage of the act of March, 1825; by which act the third auditor of the treasury was authorized to examine and adjust the claims which had been presented under the former acts. This claim was then re-presented under the last mentioned act, and was finally allowed and paid to the complainant as the agent of district No. 1 in Buffalo. In the meantime the town of Buffalo had been divided, and the new town of Amherst erected therefrom, leaving, however, the village in the old town, or that part which continued to retain the former name of Buffalo. And upon the re-division of the town into school districts, in October, 1823, the village was divided and formed into two districts, numbered by the commissioners upon such re-division one and two. But lot No. 73, the former site of the school house which was burned in 1813, upon that division fell within the limits of the new district No. 1. The trustees of that district constituted the second class of claimants, and insisted that they were entitled to the whole fund. The trustees of the new school district No. 2, as erected in 1823, were the third class of claimants, and claimed in behalf of the inhabitants of their district a rateable proportion of the fund with district No. 1; and in opposition to the claim set up by Chapin and Wells

1837.

Potter
v.
Chapin.

in behalf of themselves and the other contributors to the fund for the erection of the school house.

Potter, the complainant, paid the fund into court; and the several defendants having put in their answers insisting upon their respective claims as above stated, the usual decree was made discharging the complainant from the controversy, with costs to be paid out of the fund. And the cause was referred to a master to take proof as to the rights of the several defendants as between themselves. Upon the coming in of the master's report the vice chancellor decreed the whole fund to district No. 1, to the exclusion of district No. 2; and he directed Chapin and Wells and their associates to pay to district No. 1 the costs of the complainant which had been taken from the fund, and also the costs of that district in the defence of the suit. Chapin and Wells appealed from the whole decree; but no notice of their appeal was served upon the solicitor of the trustees of school district No. 2. The trustees of that district also appealed from so much of the decree as adjudged and declared that they were not entitled to any part of the fund; but Chapin and Wells were not made parties to that appeal by the service of any notice of such appeal upon their solicitor within the time allowed by law.

The following is the opinion delivered by the vice chancellor at the time of making the decree appealed from:

A. GARDNER, V. C.   The first point made by the school districts is that the acts of the original builders of the school house mentioned in the pleadings amounted to a dedication of the same to the public. The dedication of property to the public must depend, like every other grant, upon the intent of the parties. The nature of the property itself, the situation of the country, the acts and declarations of the owner, the unmolested enjoyment of the public of the property, are all proper subjects of consideration as evidence in determining the intent of individuals to appropriate private property for the benefit of the public. It was accordingly said in *Dunning* v. *Roome*, (6 *Wend. R.* 657,) that

whether the right in the public attaches after five or six years, or not till the expiration of twenty, depends upon the circumstances of each particular case ; that an act on the part of the owners may be so clear and unequivocal in its character as to constitute a dedication, if immediately followed by public use, though the time of that use should be very brief. What evidence does the present case furnish of such an intention upon the part of Chapin and his associates ? From the deposition of Kaene it appears that the witness was a resident of Buffalo before the house was built ; that he was present at a meeting of the citizens when it was determined to build the house, and when a subscription was started to raise the required funds ; that there were several single men who were not residents but who subscribed ; that he subsequently worked upon the house, but he neither asked or received any thing for his services ; that he supposed and believed that all that was done towards the erection of the house by others was done for the general benefit of all who wished to send to school ; that the house was placed upon the lot where it was burned, because it was understood and believed that the lot was to be given as a school house lot by the Holland Land Company ; that those who contributed never claimed or received, or expected to receive, rent for the use of the house ; that no taxes were imposed upon the house, and that from the time of its erection in 1806 until it was burned in 1813 it was generally occupied as a school house, except that it was occasionally occupied as a meeting house. It is true that this deponent (who is one of the defendants) states that he and other of the contributors had, in his opinion, a right to dispose of their shares in any manner they thought proper. He could hardly have said less after having voluntarily became a party to this litigation. It is his mere opinion, however —never, so far as it appears, expressed to others; and, therefore, in no way impugning the legal effect of the facts to which he distinctly testifies. The testimony of Judge Walden, another of the defendants, confirms that of Kaene in every important particular. He does not pretend, however, that he entertained the opinion that he possessed any exclusive rights

in relation to this house. So far from it, he states that when compensation was claimed from government in behalf of the district, he heard of it but made no opposition; and subsequently, when the money was received, he interposed a claim thereto in behalf of district No. 2, in which he resides. I have adverted to the depositions of the defendants in preference to those of other witnesses, and it is to be presumed that they have stated their own case as favorably as the facts will warrant. And it seems to me their statements, in connection with admitted facts, furnish as strong evidence of a dedication of this property to the public as is likely ever to occur. The purposes for which the building was designed; the formality of a public meeting evincing the general interest in its erection; the mode of raising the funds; the situation of some of the contributors, who could have, from their residence, no personal interest in the subject; the location of the building upon a public lot; the immediate and uninterrupted use of it by the public from the time of its erection until it was destroyed by the enemy; the fact that the business of the school was managed by a committee chosen by the citizens at large; that an application in their behalf was preferred in 1817 for compensation for its loss, to the knowledge, certainly, of one of the defendants, and probably of all of them; that the claim was tacitly acquiesced in by all parties; was allowed by the government; that the money was paid to the district, and no claim preferred by any of these defendants for the money until June 1831, a period of eighteen years from the destruction of the building, are all of them circumstances which point to one conclusion—an unreserved dedication of this property for the public use.

It was urged that although the contributors designed to give the use to the public, they reserved the property of the building to themselves. The location of the house, it seems to me, is a satisfactory answer to this suggestion. It was placed upon a lot which the defendants supposed and believed would be granted as a school lot to the public. The house would, of course, have passed as an incident to the land. This view is certainly inconsistent with the supposed

reservation. The case of *Ingleby* v. *Dobson*, (4 *Russ R.* 342,) is not unlike the present. A school house had there been built by subscription upon lands belonging to the lord of the manor, and it had been used by the public for a series of years. The master of the rolls upon these facts decided that the house was plainly dedicated to the purpose of a school, and that no individual could claim property in it.

Again ; by the laws of congress under which this claim was preferred, it was made the duty of the commissioners appointed according to its provisions before they proceeded to adjudicate on the claims of individuals, to prescribe and publish for eight weeks in the public newspapers rules as well in regard to the receipt of applications of claimants to compensation for losses as the species and degrees of credence to be given to evidence and the manner in which such evidence should be authenticated. The statute was equivalent to a general notice to all persons not only to prefer their claims but of the species and degrees of evidence by which they were to be supported.

The authority to adjudicate given by the act necessarily included the power to determine the question of ownership in case of conflicting claims to compensation for the loss of the same property ; and it was the duty of Chapin and his associates to have appeared, prepared their own claim and litigated the claim before the commissioners within the period limited by the statute. Failing in this, their rights were barred by the 15th section which provides " that no claim authorized by this act shall be allowed or paid unless the same be exhibited within two years from the passing hereof." The subject matter of this claim may, therefore, be considered as *res judicata,* and the decision of the 3d auditor, who by the act of 1825 was substituted for the commissioners, awarding damages to district No. 1, is conclusive upon the right of these parties. If this be correct the complainant in this cause, upon the showing of the claimants, cannot be considered as a trustee for them, except for reasons that would apply to every solicitor who receives money for his client by virtue of a decree founded

upon insufficient evidence and in a suit to which the cestui
que trust was a party.

The last question to be determined is as to the right of
district No. 2 to a share of this fund.   School district No. 1
was organized in 1815, and at that time included the terri-
tory now embraced in districts 1 and 2.   In 1817 the claim in
behalf of No. 1 was preferred before the commissioners, and
evidence was given to establish the same.  In 1823 the district
was divided, and No. 2 set off by the school commissioners ;
and in 1826 the third auditor, upon the evidence received by
the commissioners in 1817, determined in favor of the claim
of No. 1, and assessed the damages.   And this money was
paid to their attorney or committee.   The argument then
upon the part of No. 2 is substantially this : that as the claim
was preferred before a division of the district, it was in the
nature of a suit for the benefit of all the inhabitants ; that
judgment was rendered upon that claim, and that the avails
should be appropriated for the benefit of both districts.  The
answer to this view is to be found in the fact that school
districts are quasi corporations for certain purposes ; that in
this character the claim was preferred by No. 1 and enter-
tained by the government ; or if we are to adopt the analo-
gy to a suit at law, district No 1 was the plaintiff upon the
record at the time when the suit was instituted, and has had
a continual legal existence to the present moment.   The
division of territory and the erection of a new corporation
did not, it is conceived, abolish the old one, or in any man-
ner affect its legal rights.   And there is less foundation for
the opinion that district No. 2, organized six years after this
claim was preferred, has any right legal or equitable to any
portion of this fund.   It was conceded that if the school house
had been standing at the time of the division it would have
belonged to district No. 1.   (2 *John. Ch. Rep.* 320.   1
*Hopk.* 289.   2 *Wendell*, 125.)   The damages awarded for
its destruction to that district by name, in the absence of
legislative provision, must, as I apprehend, follow the same
rule.   The provisions in our statutes for the division of town
monies, and in the revised statutes in relation to property in
school districts, show the sense of the legislature, that in the

absence of such provisions personal property would in all cases belong to the old corporation. My conclusion therefore is that district No. 1 is entitled to the entire fund.

*M. T. Reynolds*, for Chapin and Wells. This was an association formed for the purpose of establishing a school house for their common benefit, with no corporate powers to be sure, but the fund was quasi corporate property and the associates were tenants in common. The money recovered for the loss of the school house is a fund held by Potter in trust for those who contributed to build it. The question is, did the donors intend to give to the public the principal as well as the interest, or the interest only? And if so, to whom was it given? to all who came within the range of its benefits? There are four or five districts who ought to have interposed their claim—or did not the original proprietors contemplate putting up a house over which they could have the control? The trust must take effect according to the intent of the parties, or not at all. Every distinguishing feature of the association was destroyed by the destruction of the house. No lapse of time will bar the right to the trust money; and here has been no waiver or abandonment on the part of Chapin and Wells of their interest in this fund. This being an implied trust, so long as the subject of it remains in the hands of the trustee this court will lay hold of it for the benefit of the cestuis que trust.

*A. Taber*, for school district No. 2. The persons who erected the school house dedicated it to the public, and cannot now be permitted to resume it. (*See argument of vice chancellor in Pennock v. Dialogue, 2 Peters' Rep.* 1; *Beatty et al. v. Lutheran Church, id.* 566, 581; *Denning v. Roome,* 6 *Wend.* 656; *Livingston v. New-York,* 8 *id.* 85; *City of Cincinnati v. White,* 6 *Peters,* 431.) The grant by the government was a proceeding to which Chapin and his associates were a party, by means of the public notice deciding the right to be in the public, and they cannot now be permitted to shew that the money granted was intended for them. (*Story's ed. Laws U. S. vol.* 3, *p.* 1544, § 12, 13, 14.

*See Jackson* v. *Houseman & Hart,* 12 *John. Rep.* 77, *and cases there cited.*) The claim was presented and preferred by H. B. Potter, for the inhabitants of the then district No. 1, and was finally proved, audited and paid to him on that claim, and he has ever since held the property as trustee for the persons then constituting that district. The division of the district in 1823 was a dissolution of the incorporation of old district No. 1, and an incorporation of two new districts, and had no effect to deprive either of the new districts of any right which they had as the inhabitants of old district No. 1, or as the original donees of the property dedicated. The dedication of the school house in question was to an association or class of the public, unincorporated, and before the existence of any school districts; as in the case cited from 2 *Peters* and 4 *Russell;* and the school house was burned while things remained in this condition. The grant of compensation by congress was in 1816, when all this class had become and was a quasi corporation, under the name of school district No. 1. The subsequent amendatory acts relate only to the remedy, not the right. In 1825 or 6, when the money was actually received and ought to have been paid over by the complainant, this quasi corporation had become two such corporations—the one comprising one half the individuals first above mentioned, claiming the whole, and the other comprising the other half of them claiming their share of the money. The right to the compensation, at law, still more in equity, arose at the date of the act of congress, not at the time of payment. The money should be divided either in proportion to the number of the inhabitants in the two districts, or in proportion to the taxable property in each district at the time the money was paid over to Mr. Potter.

*S. Stevens,* for district No. 1. The erection and use of the school house was a dedication to the public and divested the contributors for its erection of all individual interest. (2 *Peters' Rep. S. C. U. S.* 1, 566. 6 *id.* 431, 498. 6 *Wend. Rep.* 657. 4 *Russ. Rep.* 342. 4 *Paige's Rep.* 511. *Laws U. S. sess.* 1816, 1817, 1818 *and* 1825, *relative to persons*

*whose property was lost or destroyed during the war.*) The adjudication by the third auditor of the treasury in favor of district number one was final and conclusive upon all parties. (*See statutes above referred to.*) If these propositions are neither of them true, then we say that the payment by the government to district No. 1 was a donation to that district, and no other person or party has a right to question the application of that bounty. (12 *John. Rep.* 77.) District No. 2 having been set off from No. 1, after the claim had been made by No. 1 upon the general government, and no provision having been made as to the distribution of this money between the two districts, each took what real estate fell within its bounds, and the old district retained all personal property standing in its corporate name. (2 *John. Ch. Rep.* 336. *Hopkins' Rep.* 292.) The appeals should be dismissed with costs, and the appellant Chapin should be decreed to pay interest on the amount withdrawn by Potter for his costs, and interest on the costs taxed in favor of the appellees, from the time of the appeal.

THE CHANCELLOR. The first question for consideration in this case is as to the claim of Chapin and Wells, in behalf of themselves and other contributors for the erection of the school house. And upon this point I entirely concur in the conclusion at which the vice chancellor arrived, that these contributors as such are not entitled to any part of the fund in controversy. The facts in the case show conclusively that the fund raised for the purpose of erecting the school house was dedicated to the inhabitants of the village for that purpose, as a donation or gift to a public charity. Although some doubt was thrown upon the question of charitable donations, for the benefit of a community or body not incorporated so as to be capable of taking and conveying the legal title to property, by the decision of the supreme court of the United States in the case of *The Baptist Association* v. *Hart's Executors*, (4 *Wheat. Rep.* 1,) I believe it is generally admitted that the decision in that case was wrong. And it may now be considered as an established

principle of American law that the court of chancery will sustain and protect such a gift, bequest or dedication of property to public or charitable uses, provided the same is consistent with local laws and public policy, where the object of the gift or dedication is specific and capable of being carried into effect according to the intention of the donor. (2 *Kent's Com.* 286. 4 *Idem,* 508. 2 *Peters' U. S. Rep.* 566. 3 *Idem* 99. 7 *Vermont Rep.* 241.) A devise or conveyance of real estate, under the provisions of the revised statutes, may perhaps form an exception to the general principle ; as a devise of real estate can only be made to a person capable of holding the same for the purposes of the charity, and all general trusts are abolished. (2 *R. S.* 57, § 3. 1 *Idem,* 728, § 49, 729, § 62.) In the present case the object of the donation to the common fund was for the purpose of having a school house for the general benefit of the inhabitants of the village ; and not to create distinct interests in the building for the exclusive benefit of the donors, as tenants in common, which should thereafter be subject to partage among the original contributors to the fund or their assignees or personal representatives. The school house at the time of its destruction, therefore, belonged to the inhabitants of the village in their collective capacity as such inhabitants. If the house had been sold and removed instead of being burned they would have been entitled to the interposition of the equitable powers of this court to have the proceeds of the sale appropriated for the object for which the fund was originally raised and dedicated. And when all the inhabitants of the village were incorporated into a school district for the same general purposes originally contemplated by the donors, the trustees of the district were the proper persons to receive the fund given by the government as a compensation for the building, and to appropriate it for the original object. (6 *Peters' Rep.* 431. 4 *Paige's Rep.* 510.)

The appellants Chapin and Wells and their associates had therefore no interest or claim in the fund in controversy in this suit ; and having rendered this litigation necessary by their improper interference, they were very properly charged with the costs. The decree of the vice chancellor, so

far as their interests are concerned, must be affirmed with costs to the respondents.

I think, however, that the vice chancellor came to a wrong conclusion as to the rights of the inhabitants of school district No. 2, who were a part of the citizens of Buffalo, for whose use the school house was intended. The school house having been destroyed before the organization of any school district under the statute, the fund had no particular locality at the time of the division of the district in 1823. It is therefore wholly immaterial to which district the former site of the school house fell in that division. The original fund was not appropriated for the purpose of erecting and continuing a school house upon that particular lot; but for the purpose of having a school house in some part of the village, for the convenient use of the inhabitants. Indeed it appears that when a portion of the fund at least was contributed, a different location was contemplated, and the frame of the building was placed there in the first instance. But it was afterwards removed and finished upon this particular site under the mistaken supposition that the lot would be given to the inhabitants of the village by the Holland land company as a permanent site for the school house. The location of the building at that place therefore was purely accidental, and did not constitute an essential part of the dedication of the fund to this charitable use.

Neither is it material to inquire whether the payment for the building was a mere gratuity on the part of the government, or an equitable compensation for property destroyed because the government had for a time appropriated it for its own use. In either event the fund belongs to the same persons as inhabitants of the village; as the grant was to those who had sustained the loss, and not to a particular corporation. The application of Potter as the voluntary agent of the inhabitants of the district, in 1817, can be considered in no other light than as an application for those who were entitled to claim the same for the benefit of the whole of those who were beneficially interested under the acts of 1816 and 1817. The act of 1825 did not create a new right in favor of what was then district No. 1, but only re-

vived the dormant right of all the inhabitants of the original district under the former acts. And if the fact of the division of the district in 1823 had been stated to the third auditor, I have no doubt he would have apportioned the fund between the two districts upon equitable principles, if he had allowed any thing to either. But as a contest as to the division of the fund at that time might have endangered the whole, the trustees of district No. 2 did right in not interfering in the claim before the auditor, even if they were aware at that time that the trustees of district No. 1, claimed and would afterwards attempt to retain the whole for the use of their district, contrary to equity.

But it is supposed that the present school district No. 1 is the same corporation, or quasi corporation, which existed at the time the right accrued in 1816; and that the trustees thereof are therefore entitled to the whole fund by right of succession. There is nothing in the case, however, that shows they have any greater claim to be considered the original corporation than the trustees of district No. 2; except the fact that in the re-organization and re-numbering of the school districts in that part of the original town of Buffalo, in 1823, their district got the same number which had belonged to the original district when it embraced the whole village. Upon that principle the trustees of the present district No. 2 might as well have claimed all the property which at the re-division of the town into districts belonged to the district formerly called number 2, but which in this new arrangement of the districts was designated by some other number. Upon the division of a municipal corporation, unless there is some provision made by law as to its personal property, neither part is entitled to it exclusively; but it should be apportioned between the two corporations upon some equitable principle. Such I believe has been the uniform practice of the legislature in the division of towns and counties for several years past; and such is now the general law of the state, under the provisions of the revised statutes, as to the division of counties, towns and school districts. (1 R. S. 338, § 7; 365, § 6; and 479, § 67, 77.) The two districts are therefore entitled to participate

rateably in the fund in controversy in this case; and so much of the decree of the vice chancellor as is appealed from by the trustees of school district No. 2 must be reversed with costs.

As this fund was raised for a school house, and not for the purpose of paying for instruction, the proper mode of apportioning it between the two districts, if it were now practicable, would be according to the taxable property in each, which by the laws in force at the time of the division was liable to be taxed for the purpose of building school houses; and not according to the number of children between the ages of five and fifteen. And the apportionment should be made with reference to the situation of the districts at the time of the division in 1823, instead of the time when the money was actually received in 1826. A division upon that principle is now impracticable, or at least would be productive of great and unnecessary expense to the parties. It appears, however, that in 1825 the number of children in each district was precisely the same; that is, 223 in each. In the absence of other proof, therefore, it may be fairly presumed that their relative proportions were the same at the time of the division of the original district eighteen months previous to that time. The fund remaining in court must then be divided between the trustees of the two districts equally. And if the costs of the complainant which were paid out of the original fund are recovered of Chapin and Wells, under the decree in favor of the respondents against them, one half thereof must be paid over to the trustees of the other district; so as to make their share in the whole fund equal. As the appellants have not made each other parties to their respective appeals, I cannot give the costs upon the appeal or in the court below to the trustees of school district No. 2 as against Chapin and Wells. Indeed, they could have no claim against Chapin and Wells for the costs upon the appeal; as their only contest here was with the trustees of the other district, who had made an inequitable claim to the whole fund when they were only entitled to a moiety thereof. The respondents are, therefore, probably chargeable with the costs of the appeal

which has been rendered necessary by that improper claim.

The subdivision of both districts since this controversy arose cannot alter the rights of the present parties in this suit. If the new districts which have been since set off have any claims which cannot be adjusted by the commissioners of common schools under the provisions of the revised statutes, they may have their remedies against these two districts respectively if the whole fund has not been exhausted in the costs of this litigation. But that will not disturb or alter the distribution between these parties as now established. (*Attorney General* v. *Rochester, Ca. Temp. Finch,* 193. 6 *Sim. Rep.* 273, *S. C.*)