STATE OF TENNESSEE ex rel., etc., v. W. R. ELLISTON, et als.

1. CHANCERY JURISDICTION. Corporation. Trustees, of funds given for a public or charitable purpose. §§3409 and 3410, of the Code, provide that actions shall lie in the name of the State, to bring the Directors, etc., of the corporations, or the trustees of funds given for a public or charitable purpose, to an account, for the management of the property, etc. The Court say, if the objects of the trust are for private benefit, or the property and funds are appropriated to private ends, and not

State *v.* Elliston.

given or dedicated to public or charitable purposes, then the Court of Chancery, under these provisions, has no right to interfere with its administration.

2. SAME. *Same.* A corporation is held not to come within such provisions of the Code, whose charter contains the following section. " That the profits of the Company, after appropriating so much as may be judged necessary for promoting female education, the object for which the Association is formed, shall be divided into equal portions between the members of the Company."

Cases cited : Dickson, *et als. v.* Montgomery, *et als.*, 1 Swan, 340 ; Franklin *v.* Armfield, 2 Sneed, 305 ; Gass, ex'r, *v.* Ross, *et al.*, 3 Sneed, 213.

Authorities cited : Potter *v.* Chapin, 6 Paige, 650 ; Gibson, *et al. v.* Armstrong, 7 B. Monroe, 488 ; Gass & Bonta *v.* Williams, *et al.*, 2 Dana, 171.

Code cited : §§3409–3410.

---

FROM DAVIDSON.

---

Appeal from · the Chancery Court.    E. H. EAST Chancellor.

W. F. COOPER for Elliston.

ED. BAXTER for Elliott.

FREEMAN, J., delivered the opinion of the Court.

This bill is brought in the name of the State of Tennessee on the relation of C. A. Elliott, against the defendants, as President and Trustees of the corporation known as President and Directors of the Nashville Female Academy.    It is somewhat difficult, applying the ordinary rules of construction to the bill before us, to say, from its language, what is its precise object.    After careful reading, and sifting the facts as best we can from its rhetoric, giving a liberal

construction in order to sustain the bill, rather than defeat it, as it stands on demurrer, we may assume its objects to be, to enforce the specific performance of what is charged to be a charity for the promotion of female education in the city and vicinity of Nashville, and to restrain the present defendants, as Trustees, from malversation in office, and diversion of the property from the legitimate purposes and objects of the trust. While, as we have said, it would be difficult to make out the above objects with distinctness, as legally charged by the bill. Such seems to be its scope, and so it has been treated in the demurrer filed by defendants, which was sustained by the Chancellor, and we shall consider the case in this view.

The leading question raised by the demurrer, is, that the bill, on its face, shows that defendants are not the Directors, Trustees or managers of funds given for a public or charitable purpose, but that the institution of which they are Trustees, is but a private enterprise, in which the stockholders are joint owners of the property, and such owners have such vested legal rights as a Court of Equity cannot interfere with. There are other grounds of demurrer stated, but we have cited enough to raise the main question involved for discussion at present.

By §§3409 and 3410 of the Code, an action lies in the name of the State, under the terms prescribed in that chapter, "to bring the Directors, Managers and officers of a corporation, or the Trustees of funds *given for a public or charitable purpose,* to an account, for the

management and disposition of property intrusted to their care, to remove such officers or Trustees on proof of misconduct; to prevent malversation, peculation and waste; to set aside and restrain improper alienations of such property or funds, and secure them for the benefit of those interested, and generally to compel faithful performance of duty."

This bill is filed under this provision, and in order to sustain it, the funds, which may be held to include property, must be given or appropriated to a " public, or charitable purpose." If the objects of the trust are for private benefit, or the property or funds, by the tenure of the trust, are appropriated to private uses or private ends, the property private property, and not given or dedicated to public or charitable purposes, then the Court of Chancery, under these provisions, has no right to interfere with its administration. Whatever may be the rights of the parties interested as corporators, to come into that Court, to enforce their individual rights against the Trustees or Directors of the corporation for the maintenance of their own individual rights.

The facts on which this question is to be determined, are substantianlly as follows: " On the 4th of July, 1816, Robert White and Thomas Claiborne, citizens of Nashville, purchased of David McGavock, a lot of ground situated on the south-west side of said city, as it then existed, of about three acres, for the sum of fifteen hundred dollars." The deed recites that the above parties, " and the members who at present

have subscribed, or who may hereafter subscribe to an association for establishing a female academy, were the parties to this contract, and that said parties and subscribers had paid the said sum of fifteen hundred dollars; that said conveyance was made to the parties named, " in trust for the use of said association, and the different subscribers and members composing the same, for the use and purpose of erecting thereon a female academy." In the *habendum* of the deed it is recited, " the said Robert White and Thomas Claiborne, (are to hold said land, or the survivors of them, their heirs or assigns, forever, for the uses and purposes herein before expressed." The said McGavock also covenanted, on proper request, to execute to the said Trustees, any further conveyance that might be necessary to complete the title to the land.) Then follows a covenant on the part of White and Claiborne " that they will well and faithfully hold and possess the title for the uses and purposes herein expressed, and said land shall be held subject to the use and benefit of the persons who now are, or may hereafter become interested in the association for establishing a female academy on said premises, and the improvement, occupation and enjoyment thereof; shall be subject to the orders and decisions or laws of said Association." It is further provided, that the Trustees shall, by deed, when requested, transfer the legal title to the Association, or such other persons as may be required for the purposes before mentioned. We need make but one remark on this deed; that is, that it is evident

the parties to whom the legal title was conveyed, were to hold the same for the benefit of the Association referred to, and be under its direction and control.

It is pretty clear, too, from the above deed, (and certain) from after events, that it was contemplated that this Association was to assume a more permanent form, by an Act of incorporation, and the property be put under the control of that body in this new form of existence, and such is the case. On the 3d of October, 1817, the Legislature passed an Act of incorporation, entitled "An Act to incorporate the President, Trustees and Company of the Nashville Female Academy.

This Act, by §1, makes a corporate body of " every person or persons, or the legal representatives of such persons, who are, or shall become, subscribers to the Association or Company, formed at Nashville, for the purpose of establishing a female academy," and are, or shall be, proprietors of the real or personal property belonging to said Company, together with their successors and assigns. The usual powers, such as to sue and be sued, to purchase and hold real estate, and to sell and dispose of the same, are conferred on the corporators. In addition, it is authorized to make such by-laws and regulations as may be deemed necessary for the transaction of the business of the Association or Company, and conducting and governing a seminary for the education of females.

The rules prescribed for the government of the Company in this Act, provide in substance, (so far as

State *v.* Elliston.

necessary to be stated) that any subscriber, before a period fixed, who shall pay $150, shall be a joint proprietor, with all the members in the stock or property of the Company, so long as he shall conform to the laws and rules for the government of the same; that the amount which may be required to be paid by each member, shall be four hundred dollars; that the Company shall be governed by a Board of Trustees, who shall be proprietors of stock at the time, together with various regulations for the management of the affairs of the Company.

The eighth section provides, that the stock or shares of the Company shall be transferable on the Books of the Company, and in no other manner; *provided,* the President and Trustees are willing to accept the assignee as a member of the Company, of which an entry shall be made on record; and then adds, the share of any deceased person shall pass by *devise,* or descend to the legal heir of such deceased person.

By §14, it is provided, that, "the profits of said Company shall be applied, as far as shall be adjudged necessary and proper, to the purposes of furthering and promoting female education, any additional profits which it may not be adjudged by the President and Trustees, necessary to apply to that purpose, shall be paid over in equal portions to the members of the Company, for the time being, every six months."

These are all the provisions of the charter that need be noticed for the purposes of this opinion.

The question, as we have said, is, whether this is an organization, with its property given or dedicated to a public or charitable use, so as to be liable to control at the instance of the State, under the provisions of the Code cited.

We need not undertake, from the various authorities and decisions on this question, to define with certainty, what is charity. The true idea is, perhaps, as well put by the Chancellor in the case of *Potter* v. *Chapin*, 6 Paige, 650, as it can or need be done for all practical purposes. In that case, Chapin and Wells, with various other parties resident in a school district, and some who were not, by voluntary donations of money and labor, raised a fund for the erection of a school-house for the use of themselves and other inhabitants of that neighborhood or district. The school-house had been burned down by the British army in 1813, and the United States, by Act of Congress, paid its value by way of compensation for its loss. Chapin & Wells, on behalf of themselves and the other contributors, claimed this money as their individual property. The Court say, "the object of the donation to the common fund was for the purpose of having a school-house for the general benefit of the inhabitants of the village, and not to create interest in the building for the exclusive benefit of the donors, as tenants in common, which should thereafter be subject to partition among the original contributors to the fund, or their assignees or personal representatives. The school-house, therefore, at the time of its destruction,

belonged to the inhabitants of the village, in their collective capacity as such inhabitants."

It will be seen in this statement, that there was a donation to a public use, and the intention was clear, that the property was not to be held by the parties as tenants in common or joint owners.

But in the case before us, there is no donation. The parties subscribe, and, thereby, become liable to pay, and do pay the amount required to become stockholders in the Association or incorporation, and then by Article 2nd of the Act, they become joint proprietors with all the members in the stock or property of the Company.

In the next place, each subscriber is by fair construction of the Act, a stockholder in the Company to the extent of his subscription, thus acquiring a distinct property right by virtue of his subscription. It is true, the transfer of this stock is only to be made on the books of the Company, but this does not in any way, change its character as stock or property, nor give the subscription the aspect of a donation for a public use. But what brings out the distinguishing feature of this Company from a charity or public use, with still more clearness than anything else, is §14, "that the profits of the Company, after appropriating so much as may be judged necessary for promoting female education, (the object for which the Association is formed) shall be divided in equal portions, to the members of the Company."

This feature unquestionably stamps the incorpora-

tion as an Incorporated Joint Stock Company, with the usual incidents to such an organization—a division of profits among the stockholders. It further fixes the fact beyond dispute, that one of the objects of the organization was profit, and that such profits were expected to be realized by the successful management of the scheme, or else why provide for their distribution? It is true, the parties provide, so far as shall be adjudged necessary and proper, the profits shall be applied to the purpose of furthering and promoting female education; but this is nothing more than an agreement of the parties to the Association, by accepting the act of incorporation, that they may, if thought best, apply the profits to the furtherance and advancement of the business of the Company, rather than distribute to the stockholders, by way of dividends. This, however, is merely a matter of discretion, with the Board of Trustees, said Board elected by the stockholders, and, as a matter of course, reflecting their wishes and views. If they should, in good faith, judge it was not necessary or proper, at any period, to use any portion of the profits in the way indicated, then they might well divide the entire profits among the stockholders, and no one could complain. For the propriety of their action in this matter, they would be amenable alone to the stockholders, who elected them to manage the institution, in accordance with the provisions of the charter.

We cannot conceive of an institution or corporation having these features, being either a charity or a

State *v.* Elliston.

public use, in any fair sense of these terms. It has no elements of a donation or benevolence intended to be bestowed on the public, or any class of that public, farther than the incidental benefit of having a female academy, more or less convenient, to which they might send their daughters, as the parties might reside in the city, or more distant from it. But all who send and enjoy this benefit, must do so on the same terms, that is, of paying such sum for this education as may be required—as the profits contemplated in the Act must necessarily arise from this source. Can that be a charity, for which all must pay who enjoy it? We think no authority can be found, that holds such a proposition. Can that be a public use, in which the public, as such, nor any part of it, has no legal rights. Yet here the subscribers are the proprietors of the stock, and we see no reason, if they chose, why they might not, at any time, discontinue the institution, wind up its business, and say, we will no longer have the same carried on. Nor can we conceive of a charity being administered for the profit of the parties who contribute their money to an organization of this kind. The very idea of individual profit to be made for the parties who invest their money, is antagonistic to that of a charity, or a public use, or dedication to this latter purpose, for wherever profit to the party contributing the fund is provided for, it necessarily involves the idea of a trade or business carried on, not for others, as a benevolence, but for the benefit of those who invest their capital in the enterprise.

We need not go into a critical examination of the cases in our own State, or the numerous other cases cited by counsel, in support of the views above expressed. We notice a few of them, by way of pointing out the distinction we have taken, and illustrating the subject under discussion. The case of *Dickson, et als.* v. *Montgomery, et als.*, 1 Swan, 349, was a bequest, by will, to the Treasurer of Clarke and Erskine College, to be held by the Treasurer and his successors, for the benefit of home missions, and other objects of like character.

The case of *Franklin* v. *Armfield*, 2 Sneed, 305, was a case of a devise of property to Trustees, for the erection in Tennessee, of proper buildings, and the establishment therein, of a seminary of learning, for the permanent support of which, provision was made, in which was to be educated, and supported during pupilage, the children of the testator and their descendants, the children of his brothers and sisters and their descendants, and such other of the poor children of Sumner County, as the Trustees might select. This last was held a valid gift to a charity. So, in the case of *Gass, ex'r*, v. *Ross, et als.*, 3 Sneed, 213, the gift, by will, was of so much money, to be invested in bank, and other stocks, the interest to be applied annually to the schooling of the children in the bounds of Gass's school district forever, it was held this was a valid charity; and so we might go on through all of our cases, and find this essential element of a gift, a donation for benevolent or public purpose, but in none the element of profit, or use of the fund for the benefit

State v. Elliston.

of the giver as proprietor or owner of the same, with a view to devise a profit to him by such use.

The cases referred to from other States, do not differ in these features from our own, when carefully scrutinized. They all have this idea either of a gift, donation or dedication to a charitable or public use— or when conveyed by the original owner to others, for a valuable consideration, a holding, or agreement to hold by the party to whom conveyed, for the purpose of some public or charitable use, and none have the element of profit to be derived from the property to the proprietors of the fund or capital stock. In some, it is a conveyance to Trustees, for the use of a church, as the case of *Gibson et als.* v. *Armstrong*, 7 B. Monroe, 488, in which the church was the beneficiary, and entitled to the enjoyment of the property, free of charge. So, in the case of *Gass & Bonta* v. *Wilhite, et als.*, 2 Dana, 171, which was the case of an association of stockholders, where the members who were allowed to come into the society, brought in their property, and devoted it to the general interest of the body—it all being a freewill offering on their part—and were entitled, as members of the society, to equal privileges in the use of the common property, in accordance with the rules and regulations adopted by the body. The fact, that the parties were entitled to equal enjoyment of the common property, with others, was held not to detract from its character as a charitable use ; and so, we might go on, through the large mass of cases on this subject, and find that in none of them, is the element of personal indi-

State *v.* Elliston.

vidual profits, as such, to be derived to the parties contributing the fund, nor a use of the fund so as to produce such profits, to be in any event, divided or apportioned among the contributors or stockholders.

We need not go further into these cases, as we are perfectly satisfied that in no aspect of the case before us, can it be held to be a charity or public use, subject to the control of the public. What the rights of the individual stockholders are, or may be, as against the Trustees, for misuse or improper management of the trust property, is a question not involved in this case, and need not be discussed. Suffice it to say, that in any aspect of the case, we are satisfied with the decree of the Chancellor sustaining the demurrer and dismissing the bill, and affirm the same, with costs.