CORNELIUS HADDEN, executor of James H. Dandy, deceased,

*v.*

GEORGE B. DANDY et al.

A bequest made, without limitation as to its use, directly to an unincorporated but regularly-organized and well-established charitable association, is valid.

Heard on bill and answers.

The object of the bill is to obtain the direction of the court in the final execution of the will of James H. Dandy, deceased.

The clause of the will upon which the executor is in doubt is as follows:

" *Third.* All the rest and residue of my property both real and personal I give and devise to my executor hereinafter, named, in trust nevertheless, to pay all the interest, income and profits thereof to my wife during the term of her natural life, and upon her death to pay and dispose of said principal sums as follows, viz., to my niece Sarah D. Huff the sum of fifteen hundred dollars; to my niece Charlotte Bush the sum of one thousand dollars; to John Davis of the town of Belturbet, Caven County, Ireland the sum of fifty dollars per year, for and during the term of his natural life, my executor being hereby directed to retain in his hands and invest a principal sum sufficient to yield said income, and upon the death of the said John Davis the said principal sum is to be paid to the Wesleyan Methodist Society of Belturbet, Caven County, Ireland. All the remainder of the property is to be paid to the Wesleyan Methodist Society of Ireland."

The question is, whether the bequests to the "Wesleyan Methodist Society of Belturbet" and to the "Wesleyan Society of Ireland" are good.

Two several answers were filed by leave of the court, one by three gentlemen "on behalf of The Society of People called Methodists of Belturbet, Caven County, Ireland, which Society is commonly known as the Methodist Society of Belturbet," and "was formerly known as The Wesleyan Methodist Society of Belturbet;" and another by two gentlemen "on behalf of the Society of People called Methodists in Ireland commonly known as The Methodist Society of Ireland, and was formerly known as The Wesleyan Methodist Society of Ireland."

By these answers, whose allegations are not put in issue, it appears that the great John Wesley, the founder of "Methodism" in Christian religious worship and of the Christian sect called "Methodists," about the middle of the last century founded, in various parts of Great Britain and Ireland, a number of religious societies, with preachers and chapels and houses of worship, all under the governmental control of an assembly of all the preach-

ers called a " Conference." Such a conference was established in Ireland under the provisions of a deed executed by Wesley himself, and the organization under it has continued until the present time. The various societies whose preachers composed the conference acquired real property, which was vested in local trustees, and was transmitted from generation to generation, so that, although never legally incorporated, they had still, by means of the machinery of trustees, maintained and enjoyed perpetual succession both in their organization and in the title to their property.

The aggregate of these several local societies was known as " The Society of People called Methodists."

After the death of Wesley several secessions from the original society took place in Ireland, and, for distinction's sake, a practice arose of calling the original society founded by Wesley himself " The Wesleyan Methodist Society."

In 1816–1818 a division occurred in the original or Wesleyan Methodist Society of Ireland, and a new society was formed, composed, of course, of numerous local societies, which adopted the name of the " Primitive Wesleyan Methodist Society of Ireland."

It thus happened that from 1818 to 1878 there existed in Ireland two general societies, composed of numerous local societies, called respectively " The Wesleyan Methodist Society of Ireland " and " The Primitive Wesleyan Society of Ireland."

In 1871 the British parliament passed an act (*34 and 35 Vict. c. 40*), entitled "An act to alter and regulate the proceedings and powers of the Primitive Wesleyan Methodist Society of Ireland, and for other purposes." This act is cited as the " Primitive Wesleyan Society of Ireland Act." This act recognizes the organization, discipline and creed of the society by annexing it as a schedule to the act, and by referring to it in its body. It declares that all property held in trust for it shall continue to be held upon the trusts upon which it was then held until such trusts shall be changed by conference ; that the design, discipline, laws, rules &c. then prevailing shall continue until altered by vote of conference, and shall govern all members and be capable

Hadden v. Dandy.

of being enforced in the temporal courts in relation to property; that the society might by vote of conference unite or co-operate with any church or religious body or association in Ireland, and might appoint standing "trustees to hold real and personal property for the society or for any district, circuit or station thereof," and fill vacancies from time to time, each appointment of a trustee to be enrolled in the Irish chancery; and that all property once vested in said trustees shall continue to be held by such trustees upon such trusts as conference may decide.

It does not appear that any trustees were appointed by the Primitive society under this act.

Afterwards, in 1878, the two societies above named united in one society in pursuance of the provisions of this act. One of the terms of the union was that the distinctive terms "Wesleyan" and "Primitive Wesleyan," by which they had previously been known, be dropped and the term "Methodist" alone be used.

At the date of the will there was no society in Ireland bearing either of the distinctive names used by the testator in his will.

The testator was, before coming to this country, a resident of Belturbet, and a member of the "Primitive Methodist Society of Ireland." There was at that time at Belturbet both a "Primitive Methodist Society," forming part of the Newtownbutler Circuit of the Primitive Wesleyan Society of Ireland, and also a "Wesleyan Methodist Society," which formed a part of the Clone Circuit of the Wesleyan Methodist Society of Ireland. At the union above mentioned these societies were also united and became known as the "Belturbet Circuit." The testator was connected with the Primitive Wesleyan Society of Belturbet. His will was made in this country in 1882.

In 1876 the conference of the Wesleyan society appointed trustees to hold property in trust for the society and its component societies, in the manner provided in the act of parliament above set forth. Under what authority this was done does not appear, as the act above referred to did not apply to such society, and my attention was not called to any act which does. The trustees so appointed executed a declaration of trust, which has

been enrolled in the Irish chancery, and have continued to act to the present time.

A part of the constitution of the local societies or circuits is, that there shall be "stewards," who look after the temporal affairs of the society and receive and disburse its moneys. Of the three defendants who have answered on behalf of the Belturbet society, one is the superintendent minister of that circuit, and the other two are the stewards thereof.

*Mr. Benjamin A. Vail*, for the complainant.

*Mr. Thomas J. Kennedy*, for the defendants.

PITNEY, V. C.

I think there can be no doubt that the two societies named by the testator in his will are respectively the local Methodist society of Belturbet and the general Methodist society of Ireland. The addition by the testator of the word "Wesleyan" does not, in my judgment, throw the least doubt on his meaning. The previous existence there of two societies of one faith and, in the main, of one discipline, with one of which he was connected, and their subsequent union into one society, of which union he was probably aware, seems to leave no room for doubt. The case, as to this part of it, is far within the range of authoritative decisions too numerous and familiar to require citation.

It seems to be settled, by what I conceive to be the weight of authority and in accord with reason, that a voluntary unincorporated association may be a legatee of a legacy like this. It is to be observed, first, that there is here *no devise of real estate* requiring a person, natural or artificial, capable of holding the title; and, second, that there is *no perpetual continuing trust*, which can be administered only by such a person. The gift is of money and is absolute and unlimited by any trust except such as is implied by its being given to a religious society. There is no limitation of the gift to the use of the annual income, nor to any particular purpose, such as is often found in such testamentary dispositions. In order to carry out the intention of the

testator, we have only to see to it that the gift reaches the proper officer of the association. What shall afterwards become of it does not concern the court, as, so far as appears, it did not the testator. He appears to have been satisfied to give the money to the association without any direction as to how it was to be used, relying, as he might well do, upon the general and established character of the society.

That an unincorporated association of this character is competent to receive a direct and unlimited gift of money, was admitted to be settled law by Sir John Leach, in *Wellbeloved* v. *Jones, 1 Sim & S. 40*. There the bequest was to the officers of an unincorporated theological seminary, in trust to use the *income and interest* in certain specified charities. The suit was brought by the officers of the school against the executors, without bringing in the attorney-general. It was held that the attorney-general must be brought in, "because the king, as *parens patriæ*, superintends the administration of all charities, and acts by the attorney-general," and that a proper trust must be established &c. Sir John Leach, however, adds these words : "It has been held not to be necessary that the attorney-general should be a party where a legacy is given to the treasurer or other officer of some established charitable institution to become a part of the general funds of that institution; and this exception is reasonable; for the attorney-general can have no interference with the distribution of their general funds." And Mr. Boyle, in his treatise on *Charities* (at *p. 217*), states this as the law in England.

And this principle seems to have been acted upon without question in *Johnstone* v. *Earl of Harrowby, 29 L. J. Ch., 145 ; 1 De G., F. & J. 183*, where, I infer, the bequests were to unincorporated societies.

And Mr. Perry, in his treatise on *Trusts* (§ *730*), cites other English as well as American cases in support of the same rule.

The case of *Evangelical Association's Appeal, 35 Pa. St. 316*, was so much like the present as to be indistinguishable, and the subject there received full consideration by Justice Strong, who

reviewed the authorities and whose language and judgment apply here.

The same rule is supported by the judgment of Mr. Justice Baldwin, in *McGill* v. *Brown, Bright. N. P. 347*, and *Blennon's Estate, Bright. N. P. 339*.

To the same effect are the earlier cases in New York: *Potter* v. *Chapin, 6 Paige 639*, where Chancellor Walworth (at *p. 649*) says that the contrary decision of *Baptist Association* v. *Heart's Executors, 4 Wheat. 1*, is generally admitted to be wrong; *Wright* v. *The Trustees, 1 Hoffm. 202, 239, 255 ; King* v. *Woodhull, 3 Edw. 79 ; Hornbeck* v. *American Bible Society, 2 Sandf. 133 ; Banks* v. *Phelan, 4 Barb. 80.* In that case there was a bequest of $3,000 " to the Roman Catholic Church of Petersburg, in the State of Virginia," an unincorporated religious society. The learned judge, in his opinion (at *p. 89*) of this bequest, says : " It appears, however, that this is an unincorporated institution, and it is contended that, for that reason, the legacy is void. The legality of bequests for pious and charitable uses, though for the benefit of unincorporated associations, is so well established in this state that it is barely necessary to refer to the authorities." He then cites some of the authorities above cited, and proceeds : " In this case, however, *the will does not create a trust. It gives the legacy directly to the objects of the bounty of the testatrix.*" And he held the bequest good.

The later New York cases lean the other way. In *Owens* v. *Missionary Society, 14 N. Y. 380*, an unlimited bequest to an unincorporated association was held void because the general objects of the association were not charitable, and on that ground it was distinguished from the cases just cited.

In *Sherwood* v. *The Bible Society, 1 Keyes 561*, a bequest as follows : " I give and bequeath unto the Arcot Mission of the Reformed Dutch Church the sum of $3,000, *to be used for the education of the heathen boy on whose account I have heretofore advanced money,*" was held void because the association was unincorporated, and therefore unable to act as a trustee of a *special continuing trust,* as that was held to be. The opinion makes no mention of the cases earlier than *Owens* v. *Missionary*

Hadden *v.* Dandy.

*Society,* which it cites as holding the general proposition that a voluntary association cannot be a legatee. .

*White* v. *Howard, 46 N. Y. 144,* was a case of a devise of lands, and may well stand on that ground..

Numerous other cases in accord with those first above cited, are found in Mr. Randolph's learned note on the subject. *1 Jarm. Wills* (*R. & T. ed.*) *410, 411, 412.* ·

A review of these leads me to the conclusion, first above stated, that a direct gift of money, without limitation as to its future use, to an unincorporated charitable association, is good.

But if it were necessary to the validity of the bequests here in question to hold that the legatee should have corporate capacity, I should be inclined to hold that the act of parliament before referred to was sufficient for that purpose. It expressly provides the machinery by which the society may acquire and hold for its purposes real and personal property, and it impliedly, at least, authorized such acquisition and holding, and subjects it to the purposes of the society as declared by its governing body. The same act authorizes the grantee of this power to unite with any other church, religious body or association in Ireland, but says nothing of the effect of such union upon the exercise of the power thus granted. I conclude that the effect would not be to destroy the power, but rather that it would be perpetuated in the association to result from the union. The result would be that the trustees previously appointed by the Wesleyan Methodist Society would, by the union, acquire the rights and be subjected to the duties and restrictions prescribed in the act.

The character and objects of the legatees are beyond question. It is a matter of history and general knowledge, of which the court takes notice without proof, that the societies formed by Wesley in the British Isles and in this country were, and still continue to be, societies engaged in promoting the Christian religion, and therefore charitable. Money given to any such society is presumably given to charity, and the gift will be upheld.

I will advise that the gifts are valid; that the fund set apart for the annuity of $50 may be paid to the "stewards," for the

11

time being, of the Belturbet circuit, and the residue be paid to the permanent trustees of the general society or conference for Ireland. Such payment may be made under the supervision of a special master and upon such vouchers as he may approve; and upon his report a decree may be made discharging the executor.

Costs of both parties, with a reasonable counsel fee to be fixed, will be paid out of the fund.